Thank you, Your Honor. May it please the Court. The District Court's summary judgment of non-infringement should be vacated because it is based on an incorrect claim construction. And the District Court's summary judgment of obviousness should be reversed because of the existence of genuine issues of material fact. I would like to start with infringement and claim construction. The District Court erred when it read the word elongated in the claim. There is nothing in the claim that limits the shape of the conscious stabilizer. There is no basis in the prosecution history to limit the stabilizers to elongated stabilizers. PLANTRONICS never distinguished any prior art based on the shape of the stabilizer, never even used the word elongated in the prosecution history. And elongated is used just one time in the specification to describe, quote, one embodiment of the stabilizer in which the stabilizer includes a supporting member that is elongated. There was a prosecution history that suggested there was a division made and the patent owner selected one embodiment to go forward, and that was the one that has this elongated language in it. Does that mean that this particular aspect of the prosecution history deserves a little extra attention? We would submit that you can consider it, but we would submit that it absolutely does not show that the claim should be limited to elongated stabilizers. And the reason why is because you have to look at the election requirement made by the examiner. And there were four different figures. Well, there's four different species, figures 1A and 1B, figure 2B, figure 2C, and figure 2A. And if you look at the difference between those species and look at how it's described in the specification, the difference is based on how the receiver is attached to the stabilizer, not based on the stabilizer shape. And I'm going to tell you why that's so. So first of all, if you look at column 2, line 68, you'll see that figures 1A and B are described as using an air cushion to attach the receiver. At column 4, lines 2 through 5, figure 2A is described as using curved members that surround the receiver. For figure 2B, which is described at column 4, lines 14 through 17, it's described as using curved members that engage holes in the receiver. And then finally, for the last species, figure 2C, it's described as having an end of the stalk that is inserted into a hole in the receiver. That's at column 4, lines 30 through 38. So the differences lie in how that receiver is attached to the stabilizer. Now, further evidence that it's not based on the shape of the conscious stabilizer is the fact that other non-elected species have elongated supporting members. For example, if you look at figure 2C, which is on page A31, that is said as having a support stalk that is elongated. Even more, I think, clearly... That's the donut-shaped one? That's correct. Even more critically, if you look at column 4, lines 23 through 25 of the specification, there you'll see that the stabilizer shape for two different species, one being in figure 2A and the other one being in figure 2B, have the exact same shape. The specification says, in the embodiments of figures 2A and 2B, the support arch 55 provides support for the conscious stabilizer pad. Those two species have the exact same element described as being their stabilizer shape. So, of course, it can't be stabilizer shape that was the basis for the election. Instead, the basis for the election is how the receiver attaches to the stabilizer. That is the difference between these species. But there's no discussion in the prosecution history other than saying you have to make an election and then we make an election based on the figures. It's not really clear why the examiner thought an election was necessary or what the basis for the election was. I think that in the examiner's silence, we have to look and determine for ourselves what we think it is. And I think I've presented the reasons why one would conclude a reasonable person reviewing the prosecution history, the public, would conclude that it's based on how the attachment to the receiver and not the shape. Many of the shapes are the same. And then on top of that, in order for the prosecution history to allow you to read things into the claim, they're supposed to be clear and unambiguous as a vowel. And there is no such thing here. Now, the magistrate judge seemed to think that the parties had agreed to this elongated point. The quote from the magistrate judge's opinion is both parties seem to agree that the patent describes a stabilizer in one embodiment as including a member that's elongated and flexible. Therefore, he says, I'm going to say it's elongated. This court's case law would hold that when you've got one embodiment in a specification that has a particular shape, that doesn't mean that you limit all the claims to that one embodiment. Did you make it very clear to the magistrate judge that you were limiting your elongated agreement to the single embodiment? That's correct. And we also argued for a claim construction that did not have the word elongated in it. If I could, I'll move on to obviousness. So, first, ALIS concedes the district court erred in granting summary judgment of obviousness of the unasserted claims. So, at a minimum, this court must reverse that portion of the district court's judgment. This court should also reverse summary judgment of obviousness of Claim 1 for the same reason that the district court found no infringement. As you know, the district court held that Claim 1 was not infringed because Claim 1 requires a stabilizer member that is separate and distinct from the past. That's at page A2966. As to those claims, though, you're now abandoning any non-infringement argument, is that right? That's correct. Okay. So, you're conceding the non-infringement as to those, but you're saying based on the same grounds that he asserted that he found non-infringement, he has to find non-obviousness. That's exactly correct. But in that, okay, go ahead. This is only if we don't reverse on your first issue. That's true. We don't even get there. Well, I think that if you, I think you have to address obviousness no matter what under cardinal chemical. Even if we reverse on claim construction? Oh, you're saying if you reverse on claim construction. Right. So, if you reverse on claim construction. We don't even get to any of this. Then you don't even get to that. Then you just can reverse on obviousness as well for that same reason. I was a little concerned about the treatment of secondary considerations. Were they given consideration? When we read the district court's opinion, it looks as if the district court is saying it doesn't matter in this circumstance what the evidence is of secondary considerations. It cannot overcome. It uses this not trump a prima facie case notion. But what confuses me is this is a district court proceeding, so we're not dealing with prima facie cases. We're dealing with a case that includes all four steps of obviousness, including the secondary considerations. Is this reversible error? I believe it's reversible error, Your Honor. I would note that there is a footnote where the court says that it considered the evidence or that it wasn't impressed with it. But we would submit that the jury, there's at least a genuine issue of material fact. And the jury should be the ones that are weighing that evidence and weighing all the factors for obviousness. This is particularly so because the district court ignored genuine issues of material fact and weighed inferences in Ailiff's favor as opposed to Plantronics. For example, directing your attention to the Gears reference, that has these hoop-like support elements, which are supposed to be combined with Lieber and Komoda, which teach projecting parts and hooks that go into the ear. Now both Lieber and Komoda are using a different part of the ear, the helix, to stabilize the receiver, right? That's absolutely correct, Your Honor. This is using the concha, not the upper, the crux of the helix, right? That's correct, Your Honor. The invention is directed to using the upper concha and not the crux of the helix, which is a different part of the ear's anatomy. That, of course, gets us into the issue of how big the concha is, though. That's true. And that's an interesting point because the district court held in denying summary judgment of infringement on the Dimension II language held that exactly what constitutes the upper concha is a disputed question of fact. And so for that same reason… As I understand it, the district court's opinion on obviousness is really just that everybody knew that we had to get smaller and smaller, and there's only so many places in the ear to use for support. So when you look at how close Lieber is, why isn't that a fair analysis? Well, you have to remember that Lieber's receiver is outside the ear. It's so big that it's outside the ear. Now, when you do shrink it down into a smaller size so it fits between the tragus and antitragus, you have to ask yourself, will that combination contact the upper concha? So in order to have obviousness, it's not enough that Lieber might incidentally contact the upper concha when the receiver is huge and filling the entire concha. But when you reduce the receiver size down and you've modified it, as the district court suggests, is it still going to contact the upper concha? We would submit no. We submit that if there's an inference there, it should be that it won't. And the reason why is because the references don't say anywhere that you actually want to touch the upper concha or use it to provide this stabilization force. And so we would submit that there is a genuine issue of material fact and that any inference should have been drawn in Plantronics' favor. Going back to Gears for a minute, the district court assumed that these hoop-like support elements were stabilizers when, in fact, the reference doesn't say anything about what they're doing. In addition, the hoop-like support elements are located outside the ear canal. That's not in the upper concha. And third of all, the district court relied on speculation and hindsight when it combined these references because the different references operate based on different principles and based on different locations in the ear. There's no evidence whatsoever, and I would submit that common sense would tell you that ring-like support structures are not going to hook into a crux of the helix. So there's no basis for making any modifications to Lieber when, if you were to make the Lieber hook some sort of ring-like structure, it wouldn't even operate correctly. I think I'll save the rest of my time for rebuttals if you have questions. Elvin? Yes, Your Honor. May it please the court. If I might, I would like to directly address obviousness. Well, let's start with the elongated. How do you get a claim construction on something which isn't even in the claim? Isn't this a clear instance of importing a limitation that appears once in the specification? It isn't even a repeated element. Correct. Correct. How can this be correct? Except, and this is all I will say about that unless the court has further questions, except that when the patent examiner said there were four patentably distinct inventions, the applicant chose to go with only one, which is in Figure 1. We went over that, and Ms. Stoll explained that the distinction between those four had little to do with the shape of the stabilizer. Except that someone looking at the file history and seeing that election would be entitled to rely on that. Would they still be entitled to import a limitation from the specification? In this one circumstance. I'm fully aware of the rule that you don't ordinarily do that, which is why I answered your first question with the word correct. But in this circumstance, where the patent examiner said there is one invention, and the applicant went forward without traverse with respect to the one embodiment. But Claim 10 doesn't even mention support member. It goes with a different term, conscious stabilizer. Which is basically referring to the same portion of the Figure 1. So it's your position that this is a clear and unmistakable disclaimer of anything that wasn't elongated? Yes. Mr. Feldman, if, same question I asked Ms. Stoll, if we do reverse on construction, do we go anywhere else? Of course, Your Honor. There's a ruling that the patent is invalid because it was obvious. And that ruling would stand irrespective of your ruling with respect to claim construction. Won't it knock out obviousness? No, it would not knock out obviousness, no. Not at all. So you're saying that his obviousness conclusion or the judge's obviousness conclusion had nothing to do with the elongation? Not at all. You'll see no reference to that in his ruling on obviousness. So if we go to obviousness, Judge Rader has already brought up the issue of the treatment of objective addition of non-obviousness. And it seems to fly in the face of a lot of case law that we have that says you can't even make an obviousness determination until you've considered everything. Well, the court did consider it. I mean, at page appendix 2980, there's a consideration of those – there's a consideration by the court of those – You mean in the footnote? I beg your pardon? You mean the footnote? No, in two respects. One, the court said that even accepting as true – so the court accepted as true Plantronics' assertion on these secondary considerations. Why is the court talking about a prima facie case at all? That has an application in patent office procedure, of course, but none whatsoever in a district court. Is that error in itself? No, I don't believe it is. He's quoting this court's Weyers opinion, which itself cites the Leapfrog opinion, and he is expressly assuming the truth of Plantronics. Leapfrog was a PTO case, right? Yes, it was, but Weyers was not. And he's assuming the truth of what Plantronics said, and then he said it simply can't overcome – he said a strong prima facie case, but there are cases in this court, including, I believe, Weyers, that says that where there is a strong case of obviousness, prima facie in the sense I would suggest of otherwise, that those secondary considerations assumed by him to be true for this purpose were not sufficient to overcome the other factors for obviousness. And then he did, in a footnote, say that he didn't find the showing particularly persuasive, and it wasn't. If this court looks at – But, of course, that's all factual, and he's making all of those bindings on summary judgment. No, he's not. He's got to look at those factors together. I mean, as Your Honor's question suggests, he must look at all of those factors to determine whether or not the patent is obvious. So, what you're saying is he must have done it since he had to have done it. No, I'm saying he said he did it. He said, assuming everything that Plantronics said to be true with respect to secondary considerations, they were not sufficient to overcome – But he's weighing the gram factors. He never once says no reasonable jury could ever conclude otherwise when weighing these gram factors. I think that's implicit in what he said. He said, assuming that what they said is true, it's not sufficient to overcome the rest of the evidence with respect to obviousness. I'm not sure what else he could say. Well, even assuming that we get past that issue, this improper treatment of objective indicia, what about his motivation to combine analysis? I mean, basically, his entire analysis is, well, everybody wanted a better mousetrap, so of course there was a motivation to create a better mousetrap. Not at all, Your Honor. We start with Lieber, which had – Not that you want to think about mice in your ears. Although I don't know if the court has had this experience, but in this case, I wound up with my finger in my ear. Trying to figure out the diagrams, yes. I had a mirror up here. I actually sat in front of the mirror for a while yesterday. I'm glad you asked me, because that's the nub of it. If you start with Lieber, which they say has a receiver that is too large, and then direct your attention to the joint statement of undisputed facts, you find the following. What's the appendix site? I beg your pardon? What's the appendix site? The appendix site is A1455. And this is the guess. I'll wait a moment, Your Honor. Okay, go ahead. A1455. This is a joint statement of undisputed facts. You start with 20, which is that devices that utilize the anatomy of the ear have been around since the 1920s. 21, that achieving a comfortable fit has been a goal for decades before 1994. That 24, and this is the key, a person of ordinary skill in the art would be familiar with the trend toward the miniaturization of receivers for in-ear devices. This is stipulated. And that's really a reflection or an example of your holdings in leapfrog. So if you accept this as true as you must because it's stipulated, you would shrink the receiver in Lieber so that it seats, as Lieber teaches, on the antitragus. It is in front of the auditory canal because that's where you would want the sound to go. It contacts the tragus because they're exactly opposite of each other. So the receiver of the 453 claim 10 is therefore present. That leaves two additional elements in claim 10. The cushion and the stabilizer. There is no dispute that a cushion and a stabilizer are present in Lieber. I would direct your attention for that to, among other places, the Kreiner Declaration, paragraphs 8, 10, and 15, which expressly say that those things are present. And the question then becomes, if you have the right-sized receiver, is there anything about the cushion that is missing? No. And then the question becomes, is there anything about the stabilizer that is missing? The stabilizer in Lieber, it is admitted, touches the upper concha. It goes through the upper concha on its way to the helix. But more importantly— But it's not supported by the upper concha. No, but it touches, which is all that the claim requires. Well, given that you've got a small—I mean, there's not so much in the ear. I mean, anything would touch it, right? You put those big earphones on from Bose and you're touching it. But more importantly—your honor is correct—but more importantly, as you just said, 25 on the same page, your honor, and this is the key. There are only a limited number of anatomical features that any in-the-ear device can engage. If this is so easy, why didn't it happen before 1998? You had Lieber in 1933. Correct. You had Komoda in 1983. 1991, I believe. I believe. I may be mistaken. Well, my Komoda date was filed in 1983. I beg your pardon. Okay. But still, if all this miniaturization has gone on since the transistor in 1949, why didn't it happen sooner? Well, there are a number of answers that I could— You gave us an awful long description there about how the miniaturization was known, the cushion was known, in front of the ear canal was known, and I was saying to myself, when you start getting that many things and that many elements and there's a 15-year gap, you are giving me a prescription for hindsight. Not at all. Not at all. Tell me why not at all. Because— Deal with all of those. The time gap, the multiplicity of things that are required, that you're requiring me to assume everyone would put together, and then why didn't it happen? If there's this compelling need for it, why wasn't it—if it's so obvious, why didn't it happen? I'm not sure there was a compelling need for it. What you have is the trend, and once you shrink it, you only have two things left. The cushion, which remains the same. Well, the shrinkage happened many years ago. Not so. It was a trend. That's all that's stated is that there was a trend. That makes it even more interesting that the trend—at what point did the trend become small enough to make this obvious? Yeah, when did anything in the air become non-patentable? When did anything in the air— Yeah, because what you're saying is it's all become obvious. Well, actually, Your Honor, given the trend toward the miniaturization and Komodo, which actually has exactly the same kind of receiver and a cushion, the only question becomes where is the stabilizer? And given, as Your Honor indicated, the few choices of anatomy in the ear, one would, in the words of KSR, experiment and try the obvious choices. So you're saying, in response to Judge Walk's question, you are saying that at that point, given Lieber and Komodo, anything, no matter where they stabilized it, anything would have been obvious. I don't know if the answer is anything. But given the very few choices that there were, certainly this one was obvious, given that we have two references in the record, Komodo and Lieber, each of which touches the upper concha, and Komodo— Depending upon how we define the upper concha. There's no dispute in the record. That is a stipulated claim term. It's below the antihelix and above the crux of the helix, or I may have that opposite. Are any of Aleph's products patented? I don't believe there's any evidence in the record about that. But I want to be clear. Komodo absolutely goes into the upper concha. So, given the few choices that there are for stabilization, and two that touch it, one of which goes right into the upper concha, there's nothing could be more obvious than to try using the upper concha, and once you do, you've got claim 10. I find this to fly in the face of a little bit of personal experience. I've been working out for all my life, and I've been putting things in my ear so I could listen to my Rolling Stones at the same time, and I still haven't found one that stays in my ear. If this is so obvious, why hasn't it been done so much? I'm not sure that these do either, and there's no evidence in the record that suggests that, although my client probably would like me to say that. But what we have is not how well it works. All we have is whether or not it has claim 10. And given the shrunk receiver, and given the stipulation that it has... You haven't still dealt with the at least 15-year gap between Komodo and the claimed invention. And if it's so obvious, why doesn't... I'm suggesting it's still something people are working on and haven't perfected, but why the 15-year gap? I actually have an answer that goes to the question that you just asked about why they don't work better. There's no evidence to suggest that in that 15 years... I've got funny ears, right? No, but there's nothing in the record that suggests that others had tried and failed. There's nothing in the record that suggests that this was an unexpected result. There's nothing in the record that suggests that in the 15 years, people were searching for a solution that would work better. But I would direct the court's attention in particular to two or three things. One, it's acknowledged that all three of these elements, stabilizer, receiver, and cushion, were present. It's stipulated that the receiver would shrink, and there are stabilizers that can only use a limited number of anatomical features. Given that, it would not be surprising under the KSR cases and others to try putting that stabilizer in the upper concha. Thank you, Mr. Feldman. You're welcome. Ms. Stoll? First of all, I want to make sure I'm clear and correct something that I think I may have misstated. We do not dispute that obviousness must be addressed regardless of the change in claim construction. Also, I just want to point out that the joint statement of undisputed facts, none of these talks about having a stabilizer contact the upper concha. The joint statement of undisputed facts and the district court's discussion of them are just too general about the ear anatomy to support summary judgment in this situation. And we would agree with the court statement that this is just a prescription for hindsight. Finally, I just want to note that the specification does talk about the advantages of using the upper concha to provide the stabilization force. And it talks about having better comfort and better stability, and none of that is found in the prior art. As you shrink something, doesn't it become harder to stabilize it? I think that would be a matter of common sense, yes, Your Honor. Where is that addressed in this record? I don't know that I can recall anything off the top of my head that specifically addresses that. All right, thank you very much. Thank you.